# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs January 5, 2010

## STATE OF TENNESSEE v. ADRIAN TODD

**Direct Appeal from the Criminal Court for Shelby County**
No. 06-07199    Paula Skahan, Judge

---

**No. W2008-02446-CCA-R3-CD  - Filed July 8, 2010**

---

The defendant, Adrian Todd, stands convicted of second degree murder, a Class A felony. The trial court sentenced him as a Range I violent offender to twenty-three years at 100% in the Tennessee Department of Correction.  On appeal, the defendant challenges the sufficiency of the evidence supporting his conviction.  Following our review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

J.C. MCLIN, J., delivered the opinion of the court, in which ALAN E. GLENN and CAMILLE R. MCMULLEN, JJ., joined.

Robert Wilson Jones, District Public Defender; and Tony N. Brayton (on appeal) and Robert Felkner (at trial), Assistant Public Defenders, for the appellant, Adrian Todd.

Robert E. Cooper, Jr., Attorney General and Reporter; Sophia S. Lee, Assistant Attorney General; William L. Gibbons, District Attorney General; and Stacey McEndree and Byron Winsett, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### Background

In August 2004, a Shelby County grand jury indicted the defendant, Adrian Todd, for the premeditated murder of Mario Hampton. On September 18, 2008, the trial jury convicted him of the lesser included offense of second degree murder, a Class A felony. The parties presented the following testimony at trial.

Angela Hampton Threlkeld, the victim's mother, testified that her son was shot to death on March 15, 2006. He was twenty-eight at the time of his death.

Witness A,[1] an eyewitness to the shooting, testified that he was thirteen at the time of the shooting. He and witnesses B, S.H., M.S., and an unnamed fifth boy were walking to Jack's Food Store on March 15, 2006, when they saw the victim sitting in his gold Grand Marquis in the store's parking lot. Witness A said that he knew the victim through his older brother, so he stopped to speak with him. Witness A testified that he was on the driver's side of the victim's car "within hand-shaking distance." They spoke with the victim for fifteen minutes before a man approached the passenger's side of the car. Witness A said that the man had been standing in front of the store before walking to the victim's car. The man was wearing brown pants, with the right pant leg rolled up, and a hat. Witness A recognized the man from seeing him in the apartment complex where the witness lived and knew him as "Todd." Witness A stated that the man said, "'Hey, bro'" to the victim. According to witness A, the man began shooting before the victim had a chance to respond. Witness A described the shooter's weapon as a large black handgun. Witness A testified that the man held the gun inside the car, through the passenger's window, which was rolled down. He heard six shots. Witness A testified that the victim did not have a weapon.

Witness A testified that he and the other boys ran to the back of the store after the shooting, and he saw the victim drive out of the parking lot and hit a curb. The shooter ran away in a different direction than the boys. When the shooter left, the boys ran towards their home in the Bent Tree Apartments. Along the way, S.H.'s cousin, Tahirah Maxwell, picked them up in her car and took them to the victim's girlfriend's apartment. They told his girlfriend what happened and took her to the location of the shooting. Witness A said that he went home without speaking to the police at the scene because he was scared.

Witness A further testified that he spoke with police "at some point" after the shooting. The police showed him two photospreads. From the second photospread, he chose a photograph of the defendant and identified him as the shooter. Witness A also identified the defendant in the courtroom as the shooter.

Witness B, an eyewitness to the shooting and witness A's twin brother, testified that he and witnesses A, S.H., M.S., and an unnamed fifth boy were walking to Jack's Food Store on March 15, 2006, when they stopped in the parking lot to talk to the victim. After approximately ten minutes, a man wearing brown pants with the right pant leg rolled up and

---

[1] It is the policy of this court to protect the identity of minor witnesses by using their initials; however, two witnesses have the same initials, D.W., therefore, we will refer to them as Witness A and Witness B. Witness A and Witness B are twin brothers.

a brown and white shirt approached the passenger's side of the victim's car. The man said, "'Hey, you remember me?'" The victim did not respond. Witness B testified that "[the victim] turned towards [the man,] and he started shooting." Witness B heard five shots, and he said that the shooter was holding the gun inside the car. Witness B did not see the victim with a weapon, nor did he see the victim reach for anything.

Witness B testified that, after the shooting, the victim said that he had been hit, and he drove out of the parking lot, crashing into the Cazassa Apartments. Witnesses B, A, and S.H. ran in one direction while M.S. and the fifth boy ran in another direction. S.H.'s cousin, Ms. Maxwell, picked up witnesses B, A, and S.H. and took them to the victim's girlfriend's apartment. They took his girlfriend to the crime scene and went home. Witness B testified that the police showed him photospreads, but he was unable to identify the shooter. Witness B identified the defendant in the courtroom as the shooter.

S.H., an eyewitness to the shooting, testified that he was twelve years old on March 15, 2006. On that day, he and four friends were walking to Jack's Food Store when they stopped to talk to the victim, who was sitting in his car in the store's parking lot. S.H. knew the victim because he previously had dated the victim's step-daughter. S.H. testified that approximately fifteen other people were standing in front of Jack's Food Store while he and his friends were speaking to the victim. One of those people, a man in a brown and white jogging suit with the right pant leg rolled up, approached the passenger's side of the victim's car. The man said, "'Hey bro'" to the victim and pulled a black handgun from his waistband. Then, the man fired six shots at the victim. S.H. did not hear the victim say anything or reach for anything prior to the man shooting him. When the man began shooting, S.H. ran away with the twins, witnesses A and B. He said that M.S. and the fifth boy ran in a different direction. S.H. saw the shooter run between Jack's Food Store and a neighboring building. He heard the victim say that he had been shot, and he saw the victim drive away and crash into the fence of the Cazassa Apartments. As he and the twins were running, his cousin, Ms. Maxwell, stopped to pick them up in her car. She took them to the victim's girlfriend's apartment. S.H. said that the twins told the girlfriend what happened, and they took her to the scene of the shooting. The police were already there, but he did not speak with the police at that time because he was scared. He eventually spoke with investigators, who showed him photo lineups. He was unable to identify the shooter from the photographs, but he identified the defendant in the courtroom as the shooter.

M.S., an eyewitness to the shooting, testified that he was thirteen years old on March 15, 2006. On that day, he and four friends were walking to Jack's Food Store on Winchester when they stopped to talk to the victim, who was in his car in the store's parking lot. While they were talking to the victim, a man, whom M.S. identified as the defendant, approached the vehicle. The defendant said, "'What's up?'" to the victim, and he "stuck his arm through

the window." The defendant then shot the victim. M.S. said that the victim had just begun turning his head toward the defendant when the defendant shot him. M.S. did not see the victim reach for anything. M.S. began running after the first shot. He said the gun was close enough that "[his] ears started ringing." M.S. heard two more shots after he began running. He looked back at the victim and saw the victim crash his car into the Cazassa Apartments' gate, which was across the street from Jack's Food Store. M.S. said that he ran home and did not speak to the police at any point after the shooting.

Tahirah Maxwell, S.H.'s cousin, testified that on March 15, 2006, she was driving to work when she heard gunshots. She had to swerve to avoid hitting a car that crossed the road and hit the fence of an apartment complex. She later learned that the car belonged to the victim. Ms. Maxwell testified that, after she avoided the car, she saw S.H. and the twins running, so she stopped to pick them up. Then, she took them home.

Memphis Police Officer Marlon Wright, of the crime scene investigation unit, testified that he collected three spent .45 caliber bullet casings from the victim's Grand Marquis. He did not find a weapon in the car.

Dr. Karen Elizabeth Chancellor, the Chief Medical Examiner for Shelby County, testified that she performed an autopsy on the victim in March 2006. She determined that the victim died from multiple gunshot wounds. Dr. Chancellor testified that the victim had gunshot entrance wounds on his right shoulder, right arm, and the right side of his torso. She opined that the two projectiles that entered his right arm might have exited the arm and re-entered the torso, but she could not determine that with certainty. She said that it was possible that five separate bullets hit the victim. Dr. Chancellor recovered three bullets from his body. She testified that the bullet that entered the victim's right shoulder passed through his heart and right lung. The bullets that entered through his torso passed through his liver, right kidney, inferior vena cava, and small intestines. Dr. Chancellor testified that any of the wounds could have caused the victim's death. She could not determine with certainty at what distance the shooter held the gun from the victim's body, but she was able to determine that the weapon was not in contact with the body. Dr. Chancellor testified that the victim's blood alcohol content was negative, but he tested positive for THC, the active component of marijuana.

Brian Beauford, an emergency medical technician with the Memphis Fire Department, testified that he responded to a gunshot call on March 15, 2006, in the area of Winchester Road and Cazassa Road. When he arrived, he observed the victim "slumped over" the steering wheel of a vehicle that appeared to have run over a wrought iron fence nearby. He placed the victim on a stretcher and transported him to the Regional Medical Center.

Memphis Police Officer Ricky Davison, of the crime scene investigation unit, processed the victim's car at the crime scene garage. He collected a forty-five caliber bullet casing from under the driver's seat, a bullet fragment that was lodged in the bottom of the driver's seat, a spent bullet from under the seat, a spent bullet pulled from the right door post on the passenger's side, and a fabric sample with a bullet hole from the driver's seat. Officer Davison testified that he did not find a weapon in the vehicle nor anything else of significance.

Memphis Police Sergeant Caroline Mason, the case coordinator overseeing the investigation into the victim's homicide, testified that she received information about three young boys, whom a witness had seen running from the crime scene towards the Bent Tree Apartments. She learned that two of the boys might be twins, so she asked the manager of the Bent Tree Apartments whether twins lived in the complex. Sergeant Mason learned that witnesses A and B lived in the complex with their mother, so Sergeant Mason and her partner, Sergeant Mullins, went to their apartment. The twins were home, and S.H. was also with them. Sergeant Mason took the twins and their mother to the homicide office, and Sergeant Mullins took S.H. and his guardian. They interviewed the boys individually, and each boy gave statements. From them, Sergeant Mason learned that the suspect was called "Todd" and lived, at one time, in the Bent Tree Apartments. Her team canvassed the apartment complex and learned the defendant's full name. She prepared a photospread with the defendant's picture and showed the photospread to Witness A, Witness B, and S.H., individually, at the twins' home. Sergeant Mason said that two of the boys identified the defendant. She made contact with the defendant by telephone, and they agreed to meet at the homicide office to talk.

Sergeant Mason testified that the defendant read an advice of rights form and indicated that he understood his rights and wished to speak with her without an attorney present. In the defendant's first statement, he denied knowing the victim. He said that on March 15, 2006, he visited a female friend in the Bent Tree Apartments after he got off work. He took her to cash her check at a store on Winchester Road, which was near the scene of the homicide. While at the store, he saw the man from whom he had purchased his car and had a discussion with him about a purported agreement that the man would repair the car's brakes. The defendant said the man became upset and reached into his waistband, as if reaching for a gun. The defendant backed away and got into his car with his friend. They went to Walmart, and then he took her home. After he took her home, he was involved in a car accident and went to the hospital. The defendant said that he wore a white, burgundy, and tan jersey that day with the number twenty-three on it, and brown pants. Sergeant Mason said that she obtained still photographs from the liquor store's video footage that confirmed the defendant had been there. After the defendant reviewed his written statement, he admitted that he had not been truthful and wanted to make another statement.

Sergeant Mason testified that in his second statement, the defendant said that he encountered the victim when he and his friend were driving out of the Jack's Food Store parking lot on their way to Walmart. The victim accused him of cutting him off. Sergeant Mason described the encounter as a "mild road rage incident." The defendant said that he took his friend to Walmart, then back to Jack's Food Store, then to her home. While he was at the Bent Tree Apartments, he retrieved a gun from his trunk and armed himself. Then, he went back to Jack's Food Store again and encountered the victim for the second time that day. The defendant said that he believed the man from whom he had purchased his car had sent the victim because of the confrontation they had earlier that day. He was scared, but he approached the victim, who was sitting in his car talking to several young boys. The defendant said that "he thought he saw [the victim] going for a gun, at which time he started shooting into the car." Then, he got into his car and drove away, eventually having the car accident he had previously mentioned. The defendant said that he threw his gun out of his car window, but the police were unable to locate the weapon where the defendant said it might be.

After the jury returned its verdict finding the defendant guilty of the lesser included offense of second degree murder, the trial court sentenced the defendant as a Range I violent offender to twenty-three years in the Tennessee Department of Correction. The defendant now appeals.

**Analysis**

The defendant argues that the evidence was insufficient to support his conviction for second degree murder. Specifically, he contends that the state failed to prove beyond a reasonable doubt that he "knowingly" killed the victim and was not acting in self-defense. The state responds that the jury discredited the defendant's theory of self-defense and that the evidence was sufficient to support the defendant's convictions.

Our review begins with the well-established rule that once a jury finds a defendant guilty, his or her presumption of innocence is removed and replaced with a presumption of guilt. *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992). Therefore, on appeal, the convicted defendant has the burden of demonstrating to this court why the evidence will not support the jury's verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000); *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). To meet this burden, the defendant must establish that no "rational trier of fact" could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Evans*, 108 S.W.3d 231, 236 (Tenn. 2003); Tenn. R. App. P. 13(e). In contrast, the jury's verdict approved by the trial judge accredits the state's witnesses and resolves all conflicts in favor

of the state. *State v. Harris*, 839 S.W.2d 54, 75 (Tenn. 1992). The state is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. *Carruthers*, 35 S.W.3d at 558; *Tuggle*, 639 S.W.2d at 914. Questions concerning the credibility of the witnesses, conflicts in trial testimony, the weight and value to be given the evidence, and all factual issues raised by the evidence are resolved by the trier of fact and not this court. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). We do not attempt to re-weigh or re-evaluate the evidence. *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002); *Bland*, 958 S.W.2d at 659. Likewise, we do not replace the jury's inferences drawn from the circumstantial evidence with our own inferences. *See State v. Elkins*, 102 S.W.3d 581, 582 (Tenn. 2003); *Reid*, 91 S.W.3d at 277.

At trial, the state carried the burden of proving beyond a reasonable doubt that the defendant did not act in self-defense because the defendant's statement to police fairly raised the issue. *See* Tenn. Code Ann. § 39-11-203 (2006). At the time of the offenses, the statute on self-defense provided, in relevant part:

> A person is justified in threatening or using force against another person when, and to the degree, the person reasonably believes the force is immediately necessary to protect against the other's use or attempted use of unlawful force. The person must have a reasonable belief that there is an imminent danger of death or serious bodily injury. The danger creating the belief of imminent death or serious bodily injury must be real, or honestly believed to be real at the time, and must be founded upon reasonable grounds. There is no duty to retreat before a person threatens or uses force.

*Id.* § 39-11-611(a). The claim of self-defense is essentially a fact question for the jury. *See State v. Goode*, 956 S.W.2d 521, 527 (Tenn. Crim. App. 1997); *State v. Clifton*, 880 S.W.2d 737, 743 (Tenn. Crim. App. 1994); *State v. Ivy*, 868 S.W.2d 724, 727 (Tenn. Crim. App. 1993).

Second degree murder is "[a] knowing killing of another." *See* Tenn. Code Ann. § 39-13-210(a)(1). A knowing act requires one to be "aware of the nature of the conduct" and "aware that the conduct is reasonably certain to cause the result." *Id.* § 39-11-302(b). "In second degree murder, the result of the conduct is the sole element of the offense. . . . [A] result-of-conduct crime does not require as an element that an actor engaged in a specified course of conduct accomplish the specified result." *State v. Ducker*, 27 S.W.3d 889, 896 (Tenn. 2000).

Viewing the evidence in the light most favorable to the state, the evidence shows that the defendant approached the unarmed victim, who was sitting in his car speaking to five

young boys, said a few words to the victim, and then drew a forty-five caliber handgun. The defendant shot the victim at least three times and fired five to six times. The state's eyewitnesses all testified that the victim never reached for anything. One witness testified that the victim did not have time to fully turn to look at the defendant before the defendant began shooting. The defendant presented his self-defense theory through his statement to police, as presented through Sergeant Mason's testimony, and through his attorney's arguments. The trial court instructed the jury on self-defense. By convicting the defendant of second degree murder, the jury, as was their prerogative, chose not to credit the defendant's theory of self-defense. Furthermore, the question of whether the defendant "knowingly" killed the victim was a factual question for the jury, which the jury resolved in favor of the state. *See State v. Inlow*, 52 S.W.3d 101, 104-05 (Tenn. Crim. App. 2000). We will not second-guess the factual determinations of the jury. Accordingly, we conclude that the evidence was sufficient to support the defendant's conviction, and he is not entitled to relief on this issue.

## Conclusion

Based on the foregoing reasons, we affirm the judgment of the trial court.

_____
J.C. McLIN, JUDGE